IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02637-RMR-NRN

KATHARINA KATJA ISABEL MEIER, in her individual personal capacity and in her capacity as next friend of NBM, her minor child,

Plaintiffs,

v.

ASPEN ACADEMY, et al.,

Defendants.

---

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT (ECF No. 58)

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on Defendants Aspen Academy ("Aspen Academy" or the "School"), Suzanne Goodspeed, Wayne Guerra, M.D., James Johnson, Jack Keenan, Lew Kling, Corinne Lengsfeld, Brian Meegan, James Park, Kristina Scala, Arjun Sen, Brad Tucker, Lori Taylor, Tim Taylor, Darrell Watters, George Sparks, and Corey Sampson's (collectively "Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint ("Motion to Dismiss"). ECF No. 58. Judge Regina M. Rodriguez referred the Motion to Dismiss to this Magistrate Judge for recommendation on April 17, 2024. ECF No. 63. Also referred was Defendants' Motion to Stay Proceedings Pending Determination of Motion to Dismiss Plaintiffs' Second Amended Complaint ("Motion to Stay"). ECF No. 59.

The Court held a hearing on the Motion to Stay on May 23, 2024. After hearing argument, the Court granted the Motion to Stay and set a briefing schedule and hearing date of July 26, 2024 on Defendants' Motion to Dismiss. *See* ECF No. 68 (May 23, 2024 Courtroom Minutes). Plaintiffs Katherina Katja Isabel Meier ("Dr. Meier") and NBM, her minor child ("Minor Child") (collectively, "Plaintiffs"), filed their response to the Motion to Dismiss on June 14, 2024. ECF No. 69. Defendants filed their reply on June 28, 2024. ECF No. 70. The Court heard argument from the Parties on July 26, 2024. For the reasons outlined below, the Court **RECOMMENDS** that Defendants' Motion to Dismiss be **GRANTED**.

I.   **BACKGROUND**

a.   **Factual Allegations**[1]

Dr. Meier brings this lawsuit on her own behalf and on behalf of Minor Child. Dr. Meier is suing Aspen Academy, a private, nonprofit, K–8 grade school located in Greenwood Village, Colorado. Dr. Meier is also suing Aspen Academy's entire Board of Directors and other administrators. If the Court has counted correctly, there are sixteen different individually named Defendants, sued both individually and in their official capacities as board members or administrators at Aspen Academy. *See* ECF No. 24 at 1–2. Also sued are seven unnamed John Doe Defendants. The Second Amended Complaint ("SAC") is 173 pages and more than 398 paragraphs long.

---

[1] Unless otherwise noted, all factual allegations are taken from Plaintiffs' Second Amended Complaint ("SAC"), ECF No. 24, and are presumed to be true for the purposes of the Motion to Dismiss. Any citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

The lawsuit arises from an incident that occurred in October 2021 as the country and the state of Colorado were still grappling with the after-effects of the Covid-19 pandemic and policies and practices related thereto.

Minor Child had been a student at Aspen Academy beginning in the fourth grade in 2018–19. In the fall of 2021, Minor Child was a seventh-grade student at Aspen Academy. *Id.* at ¶ 38. Because of an apparent dispute with a staff member with respect to what kind of protective mask her child was supposed to wear at school, Dr. Meier was issued a "No Trespass" letter by the school president ordering her not to come onto the Aspen Academy campus. Through this lawsuit, Dr. Meier and her counsel have used the No Trespass letter to launch a broadside attack on numerous Colorado's executive orders issued by Governor Jared Polis and public health orders issued either by the State Board of Health or the Tri-County Health Department relating to Covid-19.[2] The background is as follows.

Aspen Academy had implemented certain protective mask-wearing requirements for their students and staff in light of the Covid-19 pandemic. Dr. Meier is a functional medicine doctor. *Id.* ¶ 1. On October 5, 2021, Dr. Meier had an encounter with an Aspen Academy staff member where Dr. Meier express her preference to have Minor Child wear the cloth mask that she and Minor Child's father had selected, instead of the paper mask provided by the school. *Id.* ¶ 39, ECF No. 24-9 (email dated October 5,

---

[2] For example, at paragraphs 312 through 332, the Second Amended Complaint goes on at length about how Governor Polis could have issued new laws or policies that would have complied with the requirements of the Colorado Constitution. ECF No. 24 ¶¶ 123–31. The Second Amended Complaint also attacks various public health orders as "overbroad" and "arbitrary and capricious." *Id.* ¶132. Of course, neither the Governor, nor any state or county agency, is named as a defendant in this case. Instead, Dr. Meier has sued Minor Child's school and its board and administrators.

2021). It is not clear exactly what transpired during this encounter (and the specifics are not alleged in the SAC), but later the same day, Dr. Meier made the first of two email requests to speak to the President of Aspen Academy, Kristina Scala. These emails were attached as exhibits to the SAC. The first email reads in part:

> I need your urgent assistance with [Minor Child].
>
> I told him that he was not allowed to wear any of the paper masks for medical reasons. His dad is on the same page with him wearing the masks I provided for him. I bought him plenty of cloth masks, and they are in his bag, I make sure of it every morning when I drop him off. Today even though he told me he had the cloth mask in his bag I found him wearing the paper mask when I brought him his water bottle, despite me telling him not too [sic].
>
> He acts as if the teachers are pressuring him into wearing the paper mask. Are you creating an environment that makes him feel safer going against his parents [sic] advice, a parent who is, as he knows very well, at the forefront of treating patients every day for Covid. If so, why is that?
>
> I think we should have a meeting about this including [the Minor Child] very soon. He needs to hear from you that he can wear the masks I provide for him, so he feels safe to do so.
>
> My Son's health and wellbeing is [sic] paramount above all else to me and I'll do anything to keep him safe.
>
> Thank you for your assistance.

ECF No. 24-9 at 20.

President Kristina Scala responded the same day, explaining, among other things, that Minor Child was not required to wear a school-issued mask. But President Scala did not agree to meet with Dr. Meier:

> Katija,
>
> The only reason that [Minor Child] wouldn't be wearing the mask that you sent him in would be because he lost it/misplaced it at recess or lunch and needed a replacement one to get back in the building. We do not have the capacity to manage your family's personal preference for mask type for [Minor Child] and ensure he's adhering to your wishes on it. That's between

you and him. What we will do is ensure that, if they don't have a mask, that we will give him the masks that we have available to distribute. . . .

It's [sic] occurs [sic] as both unkind and a completely unreasonable jump of logic to accuse the school of "creating an environment that makes him feel safer going against his parents [sic] advice." . . .

My suggestion is as it has been to families: put a safe break lanyard on your child's mask or put back up masks of your choosing in his pockets.

This will be forwarded to [Minor Child's] teachers so that, per your wish, they tell him that his parents have conveyed that he is to wear the cloth masks of your preference that you send him to school with and that he is expected to manage his mask so that he can be in compliance with your rules. Again, we don't have the capacity to manage this on a daily basis – ensuring that all our students are masked in adherence with Health Department regs is what we can and do manage.

Kindest regards,

Kristina

*Id.* at 21.

Later that same afternoon of October 5, 2023, Dr. Meier wrote back by email to

President Scala asking once again for a meeting. The relevant portions of this follow-up

e-mail are provided below:

Kristina,

I don't think you are correctly informed as to the occurrence of today. [Minor Child] had a mask in his school bag, as he always does, but he feels somewhat pressured or coerced into wearing something else than what we provide for him. He did not forget his mask.

I suggest that we have a meeting with him so he can explain to you how he feels about this. He was crying one day when I picked him up in 2020 after school, he was upset because he was told at school that both of his parents are going to die because we have people contact as a doctor and a pilot. You seem to be aware . . . that this current situation is creating medical and psychological problems in many children and also in our son. . . .

It is rather unfortunate and troublesome that I am being called "unkind" or "unreasonable" for pointing out a situation that was created at your school today in front of my son by one of your staff, instead of fixing it. My parental authority and decision making was questioned and undermined in front of

my son by the person who came and interrupted us talking about the mask, which is creating the exact environment that I was pointing out, the child going against the parents' wishes. Through this unfortunate interaction, a conflict was created between the parents' authority and what [Minor Child] perceives as the schools [sic] regulations, even though there might be none. It is rather "unreasonable" and "unkind", if not completely out of his role and function to address me in the way he did today in front of my son, instead of helping to fix the problem at hand. . . .

Apparently however, it is not a matter of [my son] having [a mask]. It is rather a matter of him not doing what he is supposed to and your staff actively undermining parental authority in trying to correct him on that.

I don't need you to do anything else but not to sabotage how we are trying to keep our son healthy and safe.

I would like to know the name of this person I encountered at your school today, his capacity at your school and his involvement with my son . . . and what he is licensed as and your further steps as to his interactions with me. . . .

I would also like to know from you, if you or the school have received any state, federal or otherwise funding with the condition to have the school comply with the mask wearing. Please also let me know what you are doing to capture, address and mitigate the medical and psychological damage that occur [sic] from these measures that go way beyond just undermining parental authority.

Kindest regards,

Katia Meier MD

*Id.* at 22–23.

The next day, October 6, 2021, Aspen Academy, through President Scala, sent

Dr. Meier, by both email and courier, a "No Trespass" letter banning her from the

school's campus. The letter reads as follows:

Subject: LETTER OF NO TRESPASS to Katia Meier

As a result of your behavior that disrupted class and caused both students and staff insecurity with regard to their safety both yesterday, October 5, and today, October 6, you are no longer permitted to come onto the Aspen Academy campus at any time for any purpose. This letter, a copy of which has been provided to our school resource officer, is intended to formally advise you that you have no right, either express or implied, to be IN or ON

the property located at 5859 South University Boulevard, Greenwood Village, CO at any time whatsoever and for whatever purpose. Should you not adhere to these directions, the school will have no choice but to pursue all remedies available by law, including criminal prosecution. In addition, the school will immediately require the withdrawal of your child . . . and prohibit his continued attendance at Aspen Academy.

[Minor Child's] father may drop off and pick up [Minor child] on campus.

Any parent-teacher conferences scheduled with your family will occur via zoom and will include an administrator.

The school and its students will adhere to the established and communicated mask mandate while indoors. If that is not amenable to you, you are encouraged to immediately withdraw [Minor Child] from Aspen Academy.

Thank you,

Kristina Scala

*Id.* at 24. The SAC alleges that the No Trespass letter contains "false and defamatory conclusory allegations" which were published to third parties. ECF No. 24 ¶ 44. Dr. Meier complied with the No Trespass directive.

Additional correspondence followed over the next few months, including a letter from Dr. Meier's lawyer on March 21, 2022. That letter accused Aspen Academy of "callous and reckless disrespect" for Dr. Meier and asserted the school's conduct was "unwarranted, unprovoked, and unreasonable." ECF No. 24-9 at 16. The letter included a document preservation request and a request for numerous other documents. Minor Child did not withdraw from Aspen Academy and completed middle school (through eighth grade) there.

Based on this series of events, two years and four days after getting the No Trespass letter, on October 10, 2024, Dr. Meier filed this lawsuit. *See* ECF No. 1. As

noted, the operative pleading is overly long and brings claims against sixteen named people and seen John Does, in addition to Aspen Academy.

### b. Plaintiffs' Claims

The gravamen of the SAC is that somehow Aspen Academy is a state actor and that the actions of Aspen Academy, in banning Dr. Meier from campus, were unconstitutional state actions barred by the United States and Colorado constitutions. Plaintiffs suggest that because Aspen Academy has received funds from the state and/or federal governments to assist in the battle against the Covid-19 pandemic, it became an arm of the state. Therefore, Plaintiffs argue that Aspen Academy's conduct in banning Dr. Meier from campus without due process or in retaliation for her desire to speak out on the mask issue creates a federal cause of action. For example, the SAC alleges:

> The No Trespass Order was Defendant Scala's way of forcing the mother from the school campus in an effort to keep the mother quiet about that secret [that Aspen Academy was receiving financial rewards for collaborating with the Tri-County Health Department] because the financial rewards were why Aspen Academy ignored evidence of harm to the students and continued to require them to wear masks so that Aspen Academy could continue to profit at the expense of student health and well-being.

ECF No. 24 ¶ 67. The SAC, in bringing claims against Aspen Academy and its individual directors and administrators, attempts a wholesale (if indirect) attack on a host of Colorado statutes, executive orders, and state and county health department regulations promulgated to limit the spread of Covid-19. *See id.* ¶ 347 (urging judicial review of statutes, executive orders, public health orders and the No Trespass Order, "individually and collectively, using the strict scrutiny standard of review appropriate in cases where state actions by state actors infringe upon any constitutional right").

In terms of specific claims, Plaintiffs assert the following: violation of separation of powers (Claim 1); violations of the First Amendment (Claim 2); Fifth Amendment procedural due process violation (Claim 3); Fifth Amendment substantive due process violation (Claim 4); Fifth Amendment equal protection violation (Claim 5); violation of the prohibition against cruel and unusual punishment (Claim 6); violations of the Ninth Amendment, including the fundamental right of fit parent and minor child to be free from unwarranted instruction into their relationship by state actors under color of law (Claim 7); First Amendment retaliation for engaging in protected speech activity (Claim 8); violation of separation of powers under the Colorado Constitution (Claim 9); violation of inalienable rights under the Colorado Constitution (Claim 10); violation of freedom of speech and freedom of association under the Colorado Constitution (Claim 11); violation of freedom of assembly and the right to petition under the Colorado Constitution (Claim 12); violation of the prohibition against cruel and unusual punishment under the Colorado Constitution (Claim 13); procedural due process violation under the Colorado Constitution (Claim 14); substantive due process violations under the Colorado Constitution (Claim 15); equal protection violations under the Colorado Constitution (Claim 16); for declaratory relief asking the Court to construe the meaning of and determine the validity or invalidity of various public health orders and executive orders issued during the Covid-19 pandemic (Claim 17); and for injunctive relief and damages under 28 U.S.C. § 1343(a) (Claim 18).

Every one of these 18 claims is brought against "each" of the numerous Defendants named in the case, without providing any specificity as to what each Defendant may have done with respect to any specific asserted claim.

II.    **ANALYSIS**

Defendants' Motion to Dismiss, ECF No. 58, raises numerous bases for dismissal, including statute of limitations, lack of jurisdiction for lack of standing, and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court agrees that Plaintiffs missed the statute of limitations deadline by several days and that therefore their claims are time-barred. The Court also agrees that Plaintiffs' federal constitutional claims must fail because Aspen Academy is a private entity, not a state actor. Neither the First Amendment nor any of the other federal constitutional amendments apply to this private school under these circumstances and therefore Plaintiffs' federal constitutional claims fail. Absent any surviving federal claim, this Court has no basis to retain jurisdiction to hear Plaintiffs' state constitutional claims.

a.    **Statute of Limitations**

Although the statute of limitations typically is an affirmative defense, a statute of limitations defense may be appropriately resolved on a Rule 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished. *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022). If, from the complaint, "the dates on which the pertinent acts occurred are not in dispute, [then] the date a statute of limitations accrues is . . . a question of law" suitable for resolution at the motion to dismiss stage. *Edwards v. Int'l Union, United Plant Guard Workers of Am.*, 46 F.3d 1047, 1050 (10th Cir. 1995); *see also Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2019) (stating that a court may grant a motion to dismiss based on a statute of limitations defense only "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements").

Congress did not provide a statute of limitations for actions brought under 42 U.S.C. § 1983. *Arnold v. Duchesne Cnty.*, 26 F.3d 982, 983–84 (10th Cir. 1994). Instead, a federal court looks to the law of the forum state to determine the applicable statute of limitations for a § 1983 action. *See id.* at 984. Typically, this entails looking toward the state statute of limitations for personal injury claims. *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014).

In Colorado, claims for federal constitutional violations under § 1983 have a two-year limitations period. *Blake v. Dickason*, 997 F.2d 749, 750–51 (10th Cir. 1993) (citing Colo. Rev. Stat. § 13-80-102(1)(i)). Plaintiffs do not dispute that there is, at most, a two-year statute of limitations on their claims.

Determining the accrual date of a federal civil rights action is a question of federal law that is not resolved by reference to state law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Because no federal statutory provision governs how to determine the accrual date, courts look to "federal rules conforming in general to common-law tort principles." *Id.* "Under those principles, it is 'the standard rule that accrual occurs when the plaintiff has a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Put another way, "[a] civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action," *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (quotation marks omitted), or "when the plaintiff's 'right to resort to federal court was perfected.'" *Bergman v. United States*, 751 F.2d 314, 316 (10th Cir. 1984) (quoting *Oppenheim v. Campbell*, 571 F.2d 660, 662 (D.C. Cir. 1978)).

Here, it is apparent from the face of the SAC and the attached exhibits that Plaintiffs' claims accrued on October 6, 2021, when Dr. Meier received the No Trespass letter and was banned from the Aspen Academy campus. *See, e.g.*, ECF No. 24-9 at 4–5 (March 21, 2022 letter from Dr. Meier's attorney explaining that October 6, 2021 receipt of the "Letter of No Trespass" delivered via courier to her professional medical office caused Dr. Meier "both distress and embarrassment," and saying that Dr. Meier continued to comply with the "Letter of No Trespass" "despite the same being unwarranted, without any meaningful justification, and profoundly offensive to Dr. Meier personally and professionally"); *see also id.* at 6 ("Rather, Ms. Scala appears to have summarily determined to exclude Dr. Meier from campus (and effective participation in her son's on-campus activities) with a single email. There was no due diligence inquiry, no effort to determine facts or other relevant circumstances, and no reference to any articulated policy giving rise to this seemingly arbitrary and capricious decision.").

This lawsuit was filed on October 10, 2023—two years and four days after the claims accrued.

Plaintiffs' response to Defendants' statute of limitations argument does not (for the most part) challenge either the date of accrual of Plaintiffs' claims or the applicable two-year statute of limitations. Instead, Plaintiffs argue for tolling of the statute.

In a § 1983 action, state law governs the tolling of the statute of limitations. *Braxton v. Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010). Under Colorado law, a plaintiff bears the burden of demonstrating that the statute of limitations should be tolled. *Id.* at 1159–60 (citing *Lake Canal Reservoir Co. v. Beethe*, 227 P.3d 882, 886 (Colo. 2010)).

Plaintiffs explain that the No Trespass letter threatened the removal of Minor Child from the School if Dr. Meier did not comply with its terms. And, because of the student's history and "family dynamics," there was a need for "stability and continuity in his education at Aspen Academy." ECF No. 69 at 10. Thus, without any citation to any case or other governing authority, Dr. Meier argues that the statute of limitations was (or should have been) tolled until the child was "beyond the reach of harm from Aspen Academy expelling him, i.e., until he was graduated from Aspen Academy and enrolled in a new school based upon his Aspen Academy school records." *Id.* Of course, the problem with this is that there was no suggestion that the school had threatened to expel Minor Child if his mother filed a lawsuit challenging the No Trespass letter. In addition, Minor Child graduated from Aspen Academy's eighth grade in the spring of 2023, well before the statute of limitations ran on October 6, 2023. *See* ECF No. 24 ¶ 56 ("On or about May 26, 2023, [Minor Child] was graduated from eighth grade at Aspen Academy (the highest grade level offered).").

As a general matter, equitable tolling pauses the running of, or "tolls," a statute of limitations when a litigant has pursued her rights diligently but some extraordinary circumstance prevents her from bringing a timely action. *See, e.g.*, *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Colorado recognizes that "equity may require a tolling of the statutory period where flexibility is required to accomplish the goals of justice." *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996). At the same time, "statutes of limitations compel litigants to pursue their claims in a timely manner." *Id.* at 1099. Therefore, in Colorado, equitable tolling is limited "to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly

extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." *Id.*

The Court finds no basis for tolling the statute of limitations here. There is no indication that Plaintiffs either pursued their claims diligently or that some extraordinary circumstance prevented them from filing timely.

Plaintiffs' counsel, to a degree, also falls on his sword, explaining at oral argument that he had tried to file the lawsuit on October 6, 2023 but, because he was unfamiliar with the District of Colorado's electronic filing system, he was unable to get the document submitted through the normal process. He says that he sent a copy of the initial complaint by email to the Clerk of Court's office, but it was only finally accepted for filing on October 10, 2023. Counsel promises to "move for an evidentiary hearing to correct the record" on this point. *See* ECF No. 69 at 10.

The time for briefing on the issue of the statute of limitations has come and gone. Counsel's lack of familiarity with the Court's filing system is no grounds for tolling the statute of limitations. In Colorado, "[t]he statute of limitations continues to run until all prerequisites for filing a case are met." *Broker House Intern., Ltd. v. Bendelow*, 952 P.2d 860, 862–63 (Colo. App. 1998) (holding that if a complaint is submitted to the court clerk accompanied by an insufficient funds check, then it is not "filed" with the court for purposes of the statute of limitations). The Court agrees with the Defendants that counsel's admitted inability to use electronic filing in this District does not overcome the fatal error of untimeliness.

Plaintiffs' final argument on the statute of limitations is that somehow there were additional actions after October 6, 2021 that gave rise to a new causes of action. *See*

ECF No. 69 at 11. But the actions cited were new letters or correspondence from Dr. Meier to Aspen Academy complaining about either the No Trespass order or more problems with the mask policy. For example, Plaintiffs cite a March 25, 2022 letter to the Aspen Academy Board of Trustees to "put them on notice" of the No Trespass letter and give them an "opportunity to act in their corporate governance supervisory capacity." *Id.* Plaintiffs assert that the Board of Trustees' failure to act in response to this March 2022 letter (supposedly to rectify the wrong that occurred the previous October) "gives rise to a new cause of action on March 25, 2022." *Id.* Plaintiffs cite no authority for the proposition that a failure to respond to letters or complaints about past conduct could give rise to a new cause of action. The Court is unpersuaded that it could be so.

The Court finds that the statute of limitations ran on Plaintiffs' claims on October 6, 2023. This lawsuit was filed in federal court on October 10, 2023, four days too late. Because the lawsuit was filed too late, Plaintiffs' claims are time-barred.

### b. Rule 12(b)(6) Failure to State a Claim—a Private School is not a State Actor for § 1983 Purposes

With Plaintiffs' claims time-barred, the Court could stop its analysis. But, in the event a higher authority disagrees on the statute of limitations question, the Court will address one of Defendants' other arguments for dismissal. Plaintiffs argue that Aspen Academy is a private, non-governmental entity that cannot be considered a state actor under § 1983 and, therefore, there is no basis for any of Plaintiffs' federal constitutional claims challenging various public health orders or the No Trespass letter. The Court agrees with the Defendants on this point. Plaintiffs present no authority supporting the notion that a private K–8 school (that is not involved in the acceptance of students

placed by the court or the public school system) could be deemed a state actor for § 1983 purposes.

### i.   Standard for Rule 12(b)(6) Motion to Dismiss

A court may dismiss a complaint for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard isn't "akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Thomas v. Kaven*, 765 F.3d 1183, 1190–91 (10th Cir. 2014). A court begins by identifying such items "not entitled to the assumption of truth" and then decides if the remaining well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id.* at 664.

### ii.   The Test for Whether a Private Party can be Deemed a State Actor for § 1983 Purposes

A claim under § 1983 "requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law." *Wittner v. Banner Health*, 720 F.3d 770, 773 (10th Cir.2013) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)).

The "under color of law" requirement in § 1983 cases is identical to the state action requirement of the Fourteenth Amendment. *Lugar*, 457 U.S. at 928. For a deprivation of a right to be committed under color of law, it "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged

16

with the deprivation must be a person who may fairly be said to be a state actor." *Id.* at 937. "[M]erely private conduct, no matter how discriminatory or wrongful," cannot provide the grounds for a claim brought under § 1983. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). In addition, even if a private party defendant acts "with knowledge of and pursuant to" a state statute, a plaintiff must still prove that the allegedly unconstitutional conduct is fairly attributable to the state; in other words, that the defendant may fairly be said to be a state actor. *Id.*

Therefore, to assert a federal constitutional claim under § 1983 against Defendants, Plaintiffs must establish that Aspen Academy and its board members and administrators are state actors.

The analysis is necessarily fact-based. "From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).

In cases involving extensive state regulation of private activity, the Supreme Court has "consistently held that the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Sullivan,* 526 U.S. at 52 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)). To hold a private entity to constitutional standards, there must be a "sufficient close nexus between the State and the challenged action of the regulated entity so that the action of

the latter may be fairly treated as that of the State itself." *Blum*, 457 U.S. at 1004 (citation omitted). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id*.

The Supreme Court has identified a "host of facts" that can bear on the propriety of attributing private conduct to state action. *Brentwood Acad*., 531 U.S. at 296. These include: where the challenged activity results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when the private actor operates as a "willful participant in joint activity with the State or its agents." *Id*. (citations omitted). State action also can be found when a nominally private entity is "controlled" by an agency of the State, when it has been delegated a public function by the State or when it is "entwined with governmental policies," or when government is "entwined in [the nominally private entity's] management or control." *Id*. (citations omitted).

Digesting the various Supreme Court precedents, the Tenth Circuit has set forth four tests under which a private actor may be held accountable as a state actor for a constitutional deprivation: (1) the "nexus test," (2) the "public function test," (3) the "joint action test," and (4) the "symbiotic relationship test." *Wittner*, 720 F.3d at 775.

The nexus test allows state action to be imputed to a private party when "there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448 (10th Cir.1995) (citing *Jackson*, 419 U.S. at 351). Such a nexus exists only when a state "has exercised coercive power or has provided

such significant encouragement, either overt or covert, that the [private conduct] must in law be deemed to be that of the State." *Id.* (citing *Blum*, 457 U.S. at 1004).

The public function test inquires whether the challenged action "is a traditional and exclusive function of the state." *Wittner*, 720 F.3d at 777. "This test is difficult to satisfy. While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Gallagher*, 49 F.3d at 1456 (internal quotation marks omitted). Traditional and exclusive functions of the state include such functions as administering public elections, operating towns, or managing city parks, but not educating children or enforcing statutory liens. *See id.* Proper application of the public function test requires looking at whether the services provided by Defendants are traditional and exclusive functions of the state. *See Wittner*, 720 F.3d at 777.

The joint action test asks whether the state and the private party have "acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher*, 49 F.3d at 1453. To constitute state action, the joint action must involve the state in an active role; private action taken "'with the mere approval or acquiescence of the State is not state action.'" *Wittner*, 720 F.3d at 777 (quoting *Sullivan*, 526 U.S. at 52).

The symbiotic relationship test asks whether the state has "so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Gallagher*, 49 F.3d at 1451 (internal quotation marks omitted). This analysis "starts by asking whether and to what extent the state's relationship with the private actor goes beyond the 'mere private purchase of contract services.'" *Wittner*, 720 F.3d at 778 (quoting *Brentwood Acad.*, 531 U.S. at 299) (brackets omitted); *see also Gallagher*, 49 F.3d at 1453 ("Payments under government

contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity."). "[A] public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities." *Wittner*, 720 F.3d at 778. For example, in *Milonas v. Williams*, 691 F.2d 931 (10th Cir.1982), the Tenth Circuit found a symbiotic relationship between the state and a private school for behaviorally challenged boys. 691 F.2d at 940. The school in *Milonas* had students placed there for entire school terms by courts, state agencies, and public school districts; received significant state funding to mitigate tuition, touted its state funding to prospective students; and had an educational program that was extensively regulated by the state. *Id.* In *Wittner*, the Tenth Circuit contrasted the defendant hospital's state contract to provide involuntary psychiatric holds with the school arrangement in *Milonas* and found no symbiotic relationship between the hospital and the state. 720 F.3d at 778–79. The hospital in *Wittner* had a contract authorizing acceptance of patients for involuntary holds of only 72 hours; allowed the hospital to accept or reject patients in its discretion; did not involve extensive state participation in patient care; and did not involve the state's dictation of the medical program. *Id.*

The Court finds that under the circumstances of this case, Aspen Academy is not a state actor under any of these tests.

### iii. Plaintiffs' Arguments in Favor of Aspen Academy being a State Actor

Plaintiffs, in opposing the Motion to Dismiss, make the conclusory statement that the Defendants

> acted at the behest of, in cooperation with, or in concert with, or were coerced by, or shared in financial rewards with, other state actors acting under color of law to enforce and police the state's mask mandates on school students including, but not limited to, Jared Polis, Governor of Colorado, Jill Hunsaker Ryan, Executive Director of Colorado Department of Public Health and Environment, and Mr. John R. Douglas, Jr., Executive Directo of Tri-County Health Department.

ECF No. 69 at 9. This is the only reference in the opposition to the supposed nexus between the School and the state.

At page 12 of Plaintiffs' response, they say they would "readily concede that if the Aspen Academy Defendants were not acting as state actors under color of law, then Plaintiffs have no standing, and the Court has no Article III federal question subject matter jurisdiction." *Id.* at 12. But then the brief cites to paragraphs 341–46 of the SAC, noting that the "dispositive question is 'whether the State has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State'." *Id.* (quoting *VDARE Fund v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021)). Oddly, the Plaintiff's response asserts that this "constitutes a jurisdictional question which requires full briefing to develop." *Id.*

Again, briefing on the motion to dismiss is complete. The Court set a briefing schedule on May 23, 2024, specifying that Plaintiffs were to file their response to the Motion to Dismiss by June 14, 2024. *See* ECF No. 68. Plaintiffs never sought an extension of that briefing deadline. The Court now must decide whether the SAC contains sufficient allegations to state a claim based on the pleadings and briefing that it has in front of it. *See Pa. Informed Consent Advocates Inc. v. Univ. of Pa. Health Sys.*, Civ. Action No. 21-4415, 2022 WL 2316648, at *2 (E.D. Pa. June 28, 2022) ("State actor status is a question of law properly resolved on a motion to dismiss.").

Using the standard for deciding a Rule 12(b)(6) motion to dismiss—taking all non-conclusory allegations as true—the Court does not find that Plaintiffs have plausibly alleged that Aspen Academy was acting under color of state law when it banned Dr. Meier from the campus or followed state health regulations by requiring the wearing of masks. This conclusion is reached under any of the "state actor" tests outlined by the Tenth Circuit.

First, the paragraphs of the SAC to which Plaintiffs' opposition directed the Court, paragraphs 341 through 346, do not contain any non-conclusory factual allegations. Most of those paragraphs merely recite legal tests for whether action by a private entity could be deemed state action. *See, e.g.*, ECF No. 24 ¶ 344 ("Additionally, when the government has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. at 247–48.").

Plaintiffs also put forth the wholly conclusory statement that:

> The state actors who in 2020 and 2021 acted under color of law to establish and enforce the state's mask mandate on students policy - Jared Polis, Governor of Colorado, Jill Hunsaker Ryan, Executive Director of Colorado Department of Public Health and Environment, and Mr. John R. Douglas, Jr. Executive Director of Tri-County Health Department - are individually and collectively responsible for each of Defendant's actions to enforce the state's mask mandate policy against each Plaintiff.

*Id.* ¶ 341. Without any additional factual support, this implausible assertion that somehow the Governor of Colorado or the Executive Director of the Colorado Department of Public Health and Environment were personally involved in the issuance of the No Trespass letter issued to Dr. Meier can be disregarded. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (explaining that "conclusory allegations without

supporting factual averments are insufficient to state a claim on which relief can be based").

There *are* allegations in the SAC that Aspen Academy was "receiving financial rewards for collaborating with" the Tri-County Health Department to enforce the state's mask policy. *See, e.g.*, ECF No. 24 ¶ 66. There is the assertion that Aspen Academy "acted at the behest of, in cooperation with, or in concert with, or were coerced by, or shared in financial rewards with, state actors acting under color of law to enforce and police the state's mask mandates on school students." *Id.* ¶ 69. Aspen Academy is referred to as a "willing collaborator" with the Colorado Department of Public Health and Environment and the Tri-County Health Department in compelling Aspen Academy students to comply with then-existing mask mandate. *Id.* ¶ 70. And it is alleged that the No Trespass letter was issued in part to "shut up" Dr. Meier about "Aspen Academy receiving undisclosed financial rewards for subjecting the students to the harmful physical, emotional, and mental health consequences of mask wearing at school." *Id.* at ¶ 71.

The real heart of Dr. Meier's allegation that Aspen Academy should be considered a state actor in issuing the No Trespass letter, is found at paragraphs 125 and 126 of the Amended Complaint. After reciting the slew of executive orders and public health orders issued by state and local authorities, these paragraphs state:

> [P]ervasive mask policing and enforcement by state actors became ubiquitous when private actors joined in. Not that any catalyst was needed for private policing and enforcement, but when state actors began scattering financial incentives to private sector persons and business entities, it was like throwing gasoline on an already raging fire.
>
> At the behest of the above referenced state actors, supported by non-stop media coverage, private persons and private businesses and non-governmental institutions began issuing guidelines, mandates and orders

that echoed the [state public health orders, county public health orders, and district public health orders] and then policed and enforced them to meet specified compliance goals so the private actors would reap the financial rewards offered by the state actors.

*Id.* ¶¶ 125–26. Accepting these allegations in the light most favorable to Plaintiffs—that Aspen Academy was receiving some state or federal funds as encouragement to complying with or implementing Covid-19 protocols or orders—they still do not make out a plausible case that Aspen Academy and its board members and administrators were acting under color of state law when issuing the No Trespass letter or requiring Minor Child to wear a mask.

First, it is undisputed the various executive orders, public health orders, and regulations were issued by Governor Polis and other public health authorities. These orders had the force of law. The fact that a private actor is subject to state-issued regulations, statutes, or orders, and follows those regulations or orders, does not mean that the private actor has become a state actor. *See Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir. 1994) (noting that "government regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill-Burton funds, are insufficient to establish" that a private party acted under color of state law); *Blum*, 457 U.S. at 1004 (fact that nursing home was extensively regulated was insufficient to convert it into a state actor). Similarly, the allegation that Aspen Academy may have accepted public funds in order to implement or enforce the various public health orders or to comply with Covid-19 regulations does not make Aspen Academy a state actor. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43 (1982) (a private school, which taught special needs children and received 90 percent of its funds from the government and was extensively regulated, was not a state actor within the meaning of

24

§ 1983); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159 (3rd Cir. 2001) (private school that worked in close concert with state and local governments for the treatment of juvenile sex offenders and allegedly abused a minor student was nevertheless not a state actor under § 1983 despite extensive reliance of state funding).

Per the Supreme Court's admonition in *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. at 295-96, that notwithstanding certain arguments in favor of deeming conduct by a private entity to be state action, there may be "some countervailing reason against attributing activity to the government," there is certainly such a reason here. In this instance, there is no allegation that Aspen Academy was special or different from other private schools in its receipt of government funds to assist in the implementation anti-Covid-19 public health measures. Assuming it is true that private Colorado elementary, middle, and high schools received state or federal funds as a reward (or incentive) for following or enforcing various public health orders during the Covid-19 pandemic (or to mitigate the costs of complying with such orders), that would mean that every private school became a state actor for following those public health orders and could be sued under federal constitutional standards. This would make little sense and there is no precedent for such a decision. The actors issuing mask mandates here were the Governor and various state and county health officials. Plaintiffs have not sued those parties.

To the extent that the SAC is complaining about the No Trespass letter, that letter was issued by a private school administrator and there is no plausible non-conclusory allegation of state action in connection with Dr. Meier's campus ban. To the extent Plaintiffs seek some compensation or other relief for the various Covid-19-related

mandates or orders issued by the Governor or the state and county health departments, they have sued the wrong people and entity.[3] Aspen Academy and its administrators did not issue the mask mandate or other public health orders. That they may have implemented them, followed the health authorities' guidance, or even received public funds to implement those mandates does not make them state actors. For these

---

[3] Indeed, it is apparent from the October 5-6, 2021 correspondence between Dr. Meier and Aspen Academy that, at the time, neither she nor her child formally objected to the mask mandate at all. Based on the documents attached to the SAC, Dr. Meier was distressed that her son was not wearing *the specific kind of mask* that she believed was appropriate (cloth, rather than paper). The school president responded that her son could wear whatever kind of mask his parents directed, and the president would inform her son's teachers of that. Apparently, something else transpired between Dr. Meier and a staff member on campus that caused the No Trespass letter to be issued. *See, e.g.*, ECF No. 24-9 at 27–34 (October 7, 2021 email from Dr. Meier calling the "No Trespass" letter a "gross overreaction to the events of October 5th and 6th" and giving a lengthy account of what Dr. Meier says happened when she interacted with her son and a staff member, including asking the staff member "if he was aware that what they are doing is considered child abuse by many," and mumbling "such an idiot" when the staff member responded that "all that was done was for the safety of everyone").

Oddly, and entirely inconsistent with the allegations in the SAC, in this same October 7, 2021 explanatory email, Dr. Meier effectively concedes that she had no issue with the mask requirement, but rather was upset about her treatment by the staff, saying to the school president,

> The last paragraph of your letter misrepresents what is at issue between us. Both [Minor Child] and I have adhered 'to the established and communicated mask mandates while indoors' at Aspen Academy at all times. The issue is the lack of respect for my authority as a parent to verify to my satisfaction that [Minor Child] is wearing the mask I furnish for him, and to verify to my satisfaction that school personnel are in no way interfering with my requirements for [my son] in that regard. Your failure to accommodate my requirements that [my son] wear the mask I furnish and not the mask the school furnishes is unreasonable under the circumstances and completely unacceptable to me.

ECF No. 24-9 at 31–32. This and other correspondence attached to the SAC would lead an objective observer to surmise that Dr. Meier's private dispute with Aspen Academy about being banned from campus after a disputed staff interaction has been manipulated and re-molded by Dr. Meier and her counsel for the purpose of attacking in federal court Colorado's long-since rescinded Covid-19 public health orders—a highly dubious use of legal and judicial resources.

reasons, Plaintiffs have no viable federal constitutional claims against Aspen Academy, its Board of Directors, or administrators.

## III.   CONCLUSION

The Court concludes that Plaintiffs' federal constitutional claims should be dismissed because the claims are untimely and because they do not plausibly allege that Aspen Academy was a state actor. Because these federal claims should be dismissed, the corresponding claims under the Colorado Constitution should also be dismissed. *See United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) (when all federal claims have been dismissed prior to trial, the court generally should decline to exercise supplemental jurisdiction over pendant state claims).

It is therefore **RECOMMENDED** that Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 58) be **GRANTED** in its entirety.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148–53 (1985), and also waives appellate review of both factual and legal questions.**

*Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*,

91 F.3d 1411, 1412–13 (10th Cir. 1996).

Dated at Denver, Colorado this 1st day of August, 2024

N. Reid Neureiter
United States Magistrate Judge